ALFRED C. TOEPFER, INC. and Cook Industries, Inc., Plaintiffs,

v.

FEDERAL BARGE LINES, INC. and Anderson Clayton & Co., Defendants.

No. 73 Civ. 3290.

United States District Court, S. D. New York.

Oct. 6, 1978.

Robert S. Ordman, David Botwinik, Pavia & Harcourt, New York City, for plaintiff Alfred C. Toepfer, Inc.

Bruce J. Hector, Donald M. Burke, Caspar F. Ewig, Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for plaintiff Cook Industries, Inc.

John P. D'Ambrosio, Elmsford, for Anderson Clayton & Co.

### OPINION AND ORDER

PIERCE, District Judge.

This is an action for damages caused to a shipment of 1,303 short tons of soybean meal. Plaintiffs Alfred C. Toepfer, Inc. and Cook Industries, Inc. are two corporations which buy and sell grain, including soybean meal. Defendant Federal Barge Lines owned the barge which carried the meal in question. Defendant Anderson Clayton & Co. ("ACCo") manufactured and sold the meal and loaded it onto the barge. Defendants have also crossclaimed against each other for indemnity. This action was tried to the Court from June 5 to June 12, 1978. The following shall constitute the Court's findings of fact and conclusions of law.

*Facts*

On or about October 17, 1972, Cook purchased from ACCo three barge loads of soybean meal of approximately 1,000 short tons each. ACCo chartered one of the barges, T–2078B, from Federal Barge Lines. The other two barges were chartered elsewhere and their cargo was delivered and accepted in apparently good condition. After T–2078B was loaded, the barge was sealed and placed in a tow consisting of numerous barges and towed by a tow boat belonging to Federal to New Orleans, La., where it arrived on or about December 23, 1972. Upon arrival, the barge was placed in a fleet containing numerous barges and maintained by Federal at New Orleans. Cook was notified of the barge's arrival on that date. It is undisputed that the cargo on the barge was not inspected by either plaintiff at any time prior to February 8, 1973.

On or about January 29, 1973, Cook reconsigned the cargo to Toepfer. On or about February 4, 1973, Toepfer directed that the barge be shifted to the Dockside Commodity Terminal at Belle Chasse, La. On February 8, 1973, preparations were made to discharge the cargo of the barge onto an oceangoing vessel. Toepfer's agents broke the seals of the cargo compartments, rolled back the barge covers and discovered that the soybean meal appeared "smoldering" and severely damaged. (Exhs. C, YY, XX, ZZ, AAA, BBB, ZZZ). Subsequently all parties involved denied liability and hence the within lawsuit was commenced.

*Discussion*

Despite the voluminous exhibits and depositions in this case, the contentions of the parties can be distilled to three basic issues: whether the claims against ACCo are time-barred; whether ACCo breached any obligation to provide insurance; and what caused the soybean meal damage.

Defendant ACCo contends that plaintiffs are barred from recovering from ACCo because they failed to file a claim in writing with ACCo within 30 days of the arrival of the barge at New Orleans. It is undisputed that the Trading Rules of the National Soybean Processors Association governing the Purchase and Sale of Soybean Meals ("Meal Trading Rules") apply to this action.

Rule 2, Section 5(E) of the Meal Trading Rules states: "Claims shall be waived unless submitted in writing by the Buyer within thirty (30) days after date of arrival of the car." (Exh. 3).

Plaintiffs claim that this section does not bar their claim since they question the *condition* of the meal sold to them while this section refers to the *quality* of the meal. Rule 2 of the Meal Trading Rules is entitled "Quality" and Section 5 is denoted "Adjustments for Quality." Subdivisions A through D of Section 5 discuss "Moisture." "Fiber (44% Protein)," "Fiber (49% Protein)," and "Protein."

In 1975, the Meal Trading Rules were changed to provide:

"12(a) the original shipper shall be responsible for the condition of the meal up to five (5) business days subsequent to: the arrival of the barge at destination (Milepost seventy (70) North on the Mississippi River); unloading of the barge; or inspection of the barge, whichever occurs first.

"12(b) If the barge is sold after reaching its destination (Milepost seventy (70) North on the Mississippi River), the Seller will be responsible for the condition of the meal for five (5) business days subsequent to: the arrival of the barge at destination; unloading of the barge; or inspection of the barge, whichever occurs first." (Exh. DDDD).

Plaintiffs argue that since the former rules did not deal with condition this new rule represents an addition. However, the Court finds that the mere fact of a new rule could also support the inference that the former rules did deal with condition and the time period was shortened. Further, there is substantial evidence indicating that the parties and the trade assumed that the 30-day rule did apply to claims regarding condition. (Exhs. G, HH). For example, in an arbitration opinion dated February 6, 1978, the same argument was made differentiating quality from condition and was rejected by the arbitrators. *In re Cargill, Inc.,* Case 71–10, 00087–75 (American Arbitration Ass'n Feb. 6, 1978). ("The specifications set forth in Section 3 of the Rule are clearly those referred to in Section 1 and they are the same ones treated in Section 5. All sections of the Rule are inter-related parts of the whole. Any contrary interpretation would make both the basis and the time limit for rejection wholly dependent on the whims of the buyer." *Id.* at p.3)[1] The

Court also finds the testimony of Walter Lurry III, a grain export agent for 17 years who represented both Cook and ACCo at that time to be highly credible. In essence, Lurry testified that the 30-day rule was the practice of the trade and that since the percentage of such damage was low and the cost of inspection high, a consignee frequently did not inspect and in that event chose to bear the risk of loss. (Tr. 24). James B. Smith, manager of soybean sales for ACCo from 1972, who was on the Meal Trading Rules Committee from 1972, also testified that the Committee intended to shorten the 30-day period as it applied to claims regarding condition when the Committee added Rule 12 in 1975. Thus, the Court finds that plaintiffs' claims against ACCo are time-barred by the 30-day rule of the Meal Trading Rules.

▮ Plaintiffs however assert that the 30-day rule is not applicable because ACCo breached a warranty to provide insurance on the cargo. In this regard, Section 3(a) of Rule 17 of the Meal Trading Rules provides:

"Whenever a contract is written involving the delivery of barge meal to a specified rate point in seller's freight, whether the contract is written CIF or delivered, it shall be the obligation of the seller to furnish a cargo insured bill of lading or a separate certificate of cargo insurance accompanied by the bill of lading." (Exh. 26).[2]

Defendant ACCo contends that the bill of lading herein (Exh. 6) is an insured bill of lading and that Federal was a self-insurer of the cargo. Section 10(c) of the bill of lading states:

"In connection with the assumption of liability herein provided for, the carrier [Federal] expressly waives the benefit of

---

1. Section 1 of Rule 2 of the Meal Trading Rules provides:

"The standard of quality shall be Soybean Meal of fair merchantable quality based on the season's production and conforming to standard definitions and standard specifications of the Association, which are herewith made a part of the Trading Rules and which specifications are subject to modification from season to season as conditions may warrant, upon recommendation of the Technical Committee."

Section 3 of Rule 2 describes standard specifications for soybean meal products.

2. The parties apparently agree that the terms of the sale were CIF seller's barge. See Plaintiffs' post-trial memo. p. 14; Defendant ACCo's pretrial memo. p. 45.

any protection, limitation of liability or exemption accorded it by the Harter Act (Act of February 13, 1893, 46 U.S.C. 190 et seq.) and the Limited Liability Act of March 23, 1851 (R.S. 4281 et seq. 46 U.S.C. 181 et seq.) and all acts amendatory thereof and supplementary thereto." (Exh. 6).

ACCo argues that by such waiver Federal assumed full liability to the cargo owners for any loss not specifically excluded. In *Great Lakes Transit Corp. v. Interstate Steamship Co.*, 301 U.S. 646, 649, 57 S.Ct. 915, 916, 81 L.Ed. 1318 (1937), the Supreme Court construed a similar situation, stating: "The court below concluded, and we think rightly, that by the applicable tariffs the petitioner [carrier] waived the saving clauses of the Harter Act and assumed full liability to the cargo owners for loss or damage caused by marine perils." In fact, an authority cited by plaintiffs also agrees with this interpretation of the bill of lading when he states:

"The grain trade in particular still seems to use this terminology [insured bill of lading] although an insurance certificate is not usually demanded, and the broad assumption of liability [by the barge line] seems to be accepted in its place . . . It is believed that Section 10 of the bill of lading form was deliberately worded to give complete coverage to the shipper and thereby obviate the need for cargo insurance on the shipment while waterborne." Kohlmeyer, *Common Carriage on the River*, 45 Tulane L.Rev. 828, 842–43 (1971) (footnote omitted.) [3]

The Court notes that the testimony elicited at trial also supports this conclusion. Particularly credible was the testimony of Peter Golia, a marine insurance adjuster for 17 years, who stated that Exhibit 6 is a cargo insured bill of lading and that it was the practice of the barge owners he represented to provide such cargo insurance for shippers as part of the filed tariffs. John Lindquist, ACCo's corporate risk manager,

also testified that it was the trade custom for the barge lines to assume responsibility for damage to the meal, thus making the Federal bill of lading an insured bill of lading. Even deposition testimony submitted by plaintiffs acknowledges that there would be coverage for events occurring during transit. See, *e. g.,* Finnegan p. 9; Knebel pp. 83–84.

However, plaintiffs also argue that even if the bill of lading provided insurance coverage during transit, damage occurred during loading or manufacturing when the risk of loss was with the shipper, *i. e.,* ACCo. Their contention is that ACCo breached its warranty by not providing insurance during that period of time. Thus, the next question is when or how was the meal damaged.

The Court does not find that the preponderance of the evidence indicates damage to the meal during manufacturing or loading. In fact, the evidence adduced at trial indicates that the meal met acceptable standards, as demonstrated by the Woodson-Tenent sample analysis (Exh. A) and that nothing untoward occurred during manufacturing and loading, as demonstrated by the testimony that several other barges loaded at this time were delivered without incident (Tr. 59–62). Nor does the Court find persuasive plaintiffs' assertion that the meal may have been damaged by rainfall during loading. Rather it appears that the rainfall that occurred while the barge was in transit and moored in New Orleans was more severe. (Compare Exhibits 10 & 11 with Exhibits WWW & YYY).

■ Further, there is a presumption of delivery of the goods in good order and condition when there is a clean bill of lading such as was issued here. See 46 U.S.C. § 1303(4) (1970). "A finding that a shipment is in good order may be inferred from circumstantial evidence." *Continental Grain Co. v. American Commercial Barge Line Co.*, 332 F.2d 26, 27 (7th Cir. 1964). Although plaintiffs argue that there was some inherent vice in the meal, the Court

---

**3.** In light of the Court's findings rejecting liability on the part of ACCo, the Court does not consider ACCo's contention that Cook could have filed a claim for their loss with the Cottonbelt Insurance Company.

does not find any convincing proof on this point, especially considering the testimony describing the operations at ACCo's mill and the extensive damage that was observed when the barge was finally opened in February.

"It is well settled that the carrier of goods by sea is prima facie liable for damage to cargo which, although in good condition when received by the carrier, outturns damaged at the end of the voyage, unless the carrier can affirmatively show that the immediate cause of the damage was an excepted cause for which the law does not hold him responsible." *Schroeder Bros., Inc. v. The Saturnia,* 226 F.2d 147, 149 (2d Cir. 1955). The Court concludes that there is a fair inference from the evidence [4] that the meal was damaged while it was under the control of Federal, either while in transit or while moored in New Orleans. Therefore, the Court need not find whether ACCo breached any warranty by failing to provide insurance to cover loading of the barge since the Court determines that the damage which occurred here was covered by the cargo insured bill of lading issued by Federal.

Accordingly, the Court finds for defendant ACCo and directs the Clerk to enter judgment accordingly. The Court also dismisses Federal's crossclaim against ACCo. Since plaintiffs' claims against Federal have been settled, plaintiffs are directed to submit a stipulation of settlement or proposed order of voluntary discontinuance as against Federal.

SO ORDERED.

4. Defendant ACCo also submitted evidence indicating that in November, 1972 nine inches of water was found in the bow compartment of barge T–2078B (Exh. GGG) and that during 1972 and 1973 various rain seals and cracks in the cargo hoppers of the barge were welded (Exhs. FFF, HHH, III, JJJ, KKK, LLL, MMM, NNN, OOO, PPP).